UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------x
UNITED STATES OF AMERICA,       :

                              :      21-cr-412 (JSR)

      -v-                    :

                              :      OPINION

ISRAEL GARCIA,                :

                              :

     Defendant.              :
-----------------------------------------x

JED S. RAKOFF, U.S.D.J.

On January 26, 2024, defendant Israel Garcia, a/k/a Shorty Rock, filed a motion for a new trial, arguing that his trial counsel, Avraham Moskowitz, labored under a conflict of interest because of his concurrent representation of Sherrod Murphy, a/k/a Smash, in an unrelated criminal case. See Def. Mem. in Supp. of Mot. for a New Trial ("Def. Opening Br."), ECF No. 330. On February 22, 2024, the Court held an evidentiary hearing on the motion. The Court then permitted both parties to file post-hearing briefs. After full consideration of the parties' written submissions and the evidence presented at the hearing, the Court denied the motion by "bottom-line" order dated April 5, 2024. See 4/5/24 Order, ECF No. 346. This Opinion explains the reasons for that ruling.

## I.  Factual Background

On July 21, 2021, Mr. Garcia was indicted for narcotics conspiracy and possession of a firearm during a drug trafficking crime. See Superseding Indictment, ECF No. 42. On March 8, 2022, Mr. Garcia pled guilty to conspiracy to distribute 280 grams or more of cocaine base. See 3/8/22 Tr. 5:3-9, 11:19-12:7, 12:19-13:5, ECF No. 112. A month

later, however, Mr. Garcia sent a pro se letter to the Court claiming that his then counsel, Raoul Zaltzberg, coerced him into pleading guilty. Mr. Garcia accordingly requested that the Court permit him to withdraw his guilty plea and proceed to trial with new counsel. 4/19/22 Order, ECF No. 130.

On May 2, 2022, Avraham Moskowitz was appointed to replace Mr. Zaltzberg. See 5/2/22 Order, ECF No. 144. The Court then denied Mr. Garcia's motion to withdraw his guilty plea. See 7/22/22 Mem. Order, at 8, ECF No. 208. However, on a motion for reconsideration, new evidence was brought to the Court's attention, which caused the Court to change its decision and grant the motion to withdraw Mr. Garcia's guilty plea. 12/30/22 Op. and Order, ECF No. 259. It is noteworthy that throughout the proceedings related to the withdrawal of Mr. Garcia's guilty plea, the Court observed that Mr. Garcia was dishonest. In its initial opinion denying the motion, the Court found that certain assertions in Mr. Garcia's affidavit "fl[ew] in the face of the truth." 7/22/22 Mem. Order, at 7. Then, at the hearing on the motion for reconsideration, Mr. Garcia admitted that he lied to the Court, and the Court stated on the record that "Mr. Garcia is, in effect, an admitted liar, and it's hard to believe a single word he says." 12/20/22 Tr. 4:10-5:23, 20:17-20, 34:20-25, ECF No. 260. Finally, in its opinion granting the motion, the Court noted "that Mr. Garcia has, by his own admission, repeatedly lied to the Court under oath, and so the Court does not take his current assertions of innocence as necessarily truthful." 12/30/22 Op. and Order, at 9-10.

On February 16, 2023, the Government filed a second superseding indictment that charged Mr. Garcia with murder in aid of racketeering, narcotics conspiracy, murder while engaged in a narcotics conspiracy, murder through the use of a firearm, possession of a firearm during and in relation to a drug trafficking crime, and attempted witness tampering. See Second Superseding Indictment, ECF No. 266. The indictment alleges that Mr. Garcia murdered Alfonso "Joey" McClinton. Id. The Court then scheduled the trial to begin on July 10, 2023.

At trial, Mr. Garcia was represented by Mr. Moskowitz, Deborah Colson, and Christopher Neff, all lawyers at the same law firm. The Government's main eyewitness on the murder charges was CW-1. CW-1 testified that he witnessed Mr. Garcia and Joseph Johnson (a/k/a Juice) murder Joey McClinton. 7/11/23 Trial Tr. 182:4-23, 185:8-20, ECF No. 293. CW-1 also identified Mr. Garcia and Juice as the two individuals captured on video committing the murder. 7/11/23 Trial Tr. 233:10-234:11. Mr. Moskowitz then extensively cross-examined CW-1 with multiple lines of questioning that attempted to impugn CW-1's credibility. For example, Mr. Moskowitz cross-examined CW-1 about lies he told on the stand and to the police, breaking his promise to the Government that he would stop committing crimes once he started cooperating, his extensive criminal history of violence and drug-dealing, his failure to surrender on the designated date after pleading guilty, and inconsistencies in his testimony regarding the murder and when he spoke to Mr. Garcia. 7/11/23 Trial Tr. 252-62; 7/12/23 Trial Tr. 271-324, 328-37, 350-51, 368-76, 380-81, ECF No. 295.

The Government also presented evidence that corroborated CW-1's testimony, including video footage, ballistics evidence, and testimony from CS-1, who was incarcerated at the MDC with Mr. Garcia. See Gov't Opp'n Br., at 5, ECF No. 335. Specifically, CS-1 testified that Mr. Garcia confessed to CS-1 that he had murdered someone with his sister's boyfriend, which other trial testimony indicated was a reference to Juice. 7/14/23 Trial Tr. 832-35, ECF No. 297. At the close of summations, the Court commented, outside the presence of the jury, that "Mr. Garcia, you are so lucky to have had the counsel you had in this case" because "[t]hey are, to be frank, much better than many lawyers and considerably much better than your attempt at times to be your own lawyer, as in the letters that you sent me." 7/18/23 Trial Tr. 1193, ECF No. 299.

Despite defense counsel's best efforts, the jury ultimately found Mr. Garcia guilty on all six counts. See Verdict Sheet, ECF No. 286. After the jury rendered its verdict, the Court commented that "this case was as well tried by both sides as one could possibly want." 7/19/23 Trial Tr. 1212, ECF No. 301.

Then, on August 10, 2023, the Court received a pro se letter from Mr. Garcia. He requested the appointment of new counsel, citing disagreements with Mr. Moskowitz regarding access to discovery, the filing of a Franks motion, the presentation of evidence at trial, and the failure to explain the basis for the original indictment. See 8/10/23 Letter, ECF No. 305. The letter does not mention anything about Sherrod Murphy. On August 28, 2023, the Court held a hearing.

4

At the start of the hearing, the Court noted again that "Mr. Garcia got not just good representation, he got a triple plus representation by the two defense counsel in this case, who, in the Court's view, made a closer case with the jury than virtually any other counsel would have been able to pull off, because it really wasn't a close case." 8/28/23 Tr. 3:24-4:3, ECF No. 316. In fact, the Court noted that "the proof was overwhelming," and Mr. Moskowitz "turned it into at least a little bit of a horse race only by performing at a level that [the Court] ha[s] rarely seen so well performed." 8/28/23 Tr. 5:23-6:1. In light of Mr. Moskowitz's objectively superb performance, the Court suspected that Mr. Garcia was laying the groundwork for "bring[ing] some motion on appeal for ineffective assistance of counsel, or some such nonsense." 8/28/23 Tr. 4:6-8. However, the Court ultimately relieved Mr. Moskowitz as counsel and appointed Carla Sanderson to represent Mr. Garcia at sentencing. 8/28/23 Tr. 12:1-18; 8/29/23 Order, ECF No. 307.

On December 13, 2023, only five days before Mr. Garcia's sentencing date, Ms. Sanderson informed the Court she wished to file a motion for a new trial under Federal Rule of Criminal Procedure 33 based on an alleged conflict of interest stemming from Mr. Moskowitz's concurrent representation of Mr. Murphy in a separate criminal case. The Court kept the sentencing date on the calendar but permitted Ms. Sanderson to explain the basis for the motion at the sentencing. Ms. Sanderson told the Court that "[o]n November 22, [she] learned that prior counsel, Mr. Moskowitz, represented a potential witness that had

possible exculpatory information regarding the most serious charge in the case, the murder charge." 12/18/23 Tr. 2:16-20, ECF No. 326. Although the Court was "skeptical that [it would] be a successful motion," the Court postponed the sentencing, permitted the parties to submit briefing, and scheduled an evidentiary hearing. 12/18/23 Tr. 9:13-12:4. The following evidence was then presented to the Court about the alleged conflict.

A few months before the scheduled trial, on April 25, 2023, Mr. Moskowitz was appointed to represent Mr. Murphy in a separate criminal case on unrelated charges for conspiracy to commit mail theft and postal key theft, mail theft, postal key theft, and possession of a firearm after a felony conviction. See CJA 23 Financial Aff., 23-cr-227, ECF No. 4; Indictment, 23-cr-227, ECF No. 9. Mr. Murphy, however, was referenced in the 3500 materials produced in Mr. Garcia's case. As most relevant here, the 3500 materials for CW-1 (the eyewitness to the murder) indicated that CW-1 informed the Government, during proffer sessions, that he told Mr. Murphy about the murder, that he sold drugs for Mr. Murphy, and that Mr. Murphy was a drug-dealer in the neighborhood. See Def. Reply Ex. A, at 3, 8-9, 12, 29, 34, 39, 48, ECF No. 336-1. See also 2/22/24 Tr. 26:16-27:3, ECF No. 342. Additionally, the 3500 materials for CW-5 indicated that CW-5 told the Government that Mr. Murphy was present when Joey McClinton was murdered. Def. Reply Ex. A, at 53.[1]

---

[1] Although less relevant here, other 3500 materials indicate that Mr. Murphy was a member of a rival gang. The 3500 materials for CW-6

Mr. Murphy was also referenced in police reports produced in Mr. Garcia's case. One police report states that in December 2010, Mr. Murphy told the police that "he heard Juicy and Piggy [a/k/a Anthony Alverez] were the people who shot Alphonso McClinton [*sic*] and Shorty Rock was the person who pointed them out to Juicy and Piggy." Gov't Ex. B, ECF No. 335-1. Mr. Murphy also told the police that he was "in the middle of the block when the shooting occurred and did not witness the shooting." Id. The second police report states that in March 2014, Mr. Murphy told the police that Mr. Garcia and his older brother "were responsible for the shooting murder of Anthony McClinton" but that "he has no first hand knowledge on the shooting." Gov't Ex. A, ECF No. 335-1. Mr. Murphy informed the police he did not see the shooting, as he was at the apartment of Shaquantay McClinton (the mother of his children), but he "got a call from someone on the block informing him what happened." Id.[2]

Sometime in June of 2023, "several weeks after Mr. Moskowitz was appointed to represent Mr. Murphy, [Mr. Moskowitz] reached out to the [G]overnment to ask if Mr. Murphy was the same person referenced in

---

indicated that Mr. Murphy was the member of the Mac Ballas gang. Def. Reply Ex. A, at 72. The 3500 materials also indicated that Mr. Murphy was shot as "part of the rivalry" that "le[d] up to the murder" of Joey McClinton. 2/22/24 Tr. 27:9-18, 28:19-23. Finally, the 3500 materials indicated that Mr. Murphy "met up with some people to retaliate" for the murder of Joey McClinton. 2/22/24 Tr. 28:15-18.

[2] At the hearing, Mr. Murphy initially claimed that he never spoke to the police about the murder (despite the police reports), but then invoked his Fifth Amendment right to silence as to further questions. 2/22/24 Tr. 42:1-5, 44:15-45:25, 55:12-21.

the 3500 and the Rule 16 [materials] that had been produced" in the Garcia case. 12/18/23 Tr. 9:3-6; 2/22/24 Tr. 14:14-17. After conducting its own investigation, the Government "determined that it believed it to be the same person, and informed Mr. Moskowitz so that he could make a decision about whether there was a conflict there." 12/18/23 Tr. 9:7-9. The Government also informed Mr. Moskowitz "[t]hat they were not planning on calling" Mr. Murphy as a witness in the Garcia case. 2/22/24 Tr. 15:13-17.[3]

Mr. Moskowitz then decided to visit Mr. Murphy "to speak with him about [the] information" in the materials that the Government produced. Gov't Moskowitz Decl., ¶ 5, ECF No. 335-2. Prior to this meeting, Mr. Moskowitz "believed it was possible that Mr. Murphy had information which could be helpful to Mr. Garcia." Id. So Mr. Moskowitz "wanted to run down whatever information [Mr. Murphy] had" and determine "if [Mr. Murphy] had any relevant information on the murder." 2/22/24 Tr. 11:5-6, 16:20-22. During the meeting, Mr. Moskowitz "told [Mr. Murphy] that his name was mentioned in the 3500 material," and they discussed CW-1, the information contained in the 3500 materials, and Mr. Murphy's information about the murder. 2/22/24 Tr. 17:13-17, 18:13-15, 18:24-19:1. It was during this conversation that Mr. Murphy told Mr. Moskowitz that CW-1 never spoke to him about the murder. 2/22/24 Tr. 17:17-22.

---

[3] At the evidentiary hearing, the Government confirmed that, in advance of trial, it "never reached out to Mr. Murphy to try to speak to him," and that Mr. Murphy "was never going to be a government witness." 2/22/24 Tr. 8:16-18.

After the meeting, Mr. Moskowitz determined that although "Mr. Murphy had certain information that [he] believed was helpful to Mr. Garcia's case," it was not "admissible at trial." Def. Reply Ex. C ("Def. Moskowitz Decl."), ¶ 5, ECF No. 336-3; 2/22/24 Tr. 20:4-6. Specifically, Mr. Moskowitz "determined that what [Mr. Murphy] had was hearsay" and "that the statement [Mr. Murphy] made about [CW-1] not having spoken to him about the murder was collateral," meaning Mr. Moskowitz would have been "stuck with [CW-1's] answer" on cross if he inquired about it. 2/22/24 Tr. 11:7-15. Mr. Moskowitz further determined that whatever evidence Mr. Murphy did have "was potentially devastating" for Mr. Garcia's case. 2/22/24 Tr. 31:17-18. Mr. Moskowitz thus concluded that "Mr. Murphy did not have any relevant firsthand information about the Garcia case" and "that whatever limited information Mr. Murphy could provide would not have been helpful to Mr. Garcia's case." Gov't Moskowitz Decl., ¶ 5. Mr. Moskowitz accordingly "determined that no conflict of interest existed on account of [his] dual representation of Mr. Garcia and Mr. Murphy." Gov't Moskowitz Decl., ¶ 5. See also 2/22/24 Tr. 11:15-16, 37:12-14, 37:25-38:13.

Mr. Moskowitz and Mr. Garcia have conflicting accounts of what happened next. According to Mr. Moskowitz, "[s]hortly after [his] visit with Mr. Murphy, [he] informed Mr. Garcia that [he] had spoken with Mr. Murphy and determined that he would not be a helpful defense witness at trial." Gov't Moskowitz Decl., ¶ 6. See also 2/22/24 Tr. 24:16-17 ("I explained to Mr. Garcia that it would not be in his best

interest to have Mr. Murphy called."). Mr. Moskowitz did not, however, tell Mr. Garcia about "the specific information" that Mr. Murphy told him because of attorney-client privilege. 2/22/24 Tr. 22:1-5, 32:11-14, 36:19-23. Mr. Moskowitz also "informed Mr. Garcia that if, for whatever reason, the Government decided to call Mr. Murphy as a witness at trial, [he] would potentially have to be relieved as trial counsel" because he "would not be in a position to cross-examine Mr. Murphy." Gov't Moskowitz Decl., ¶ 6; See also 2/22/24 Tr. 11:17-21. Then, "Mr. Garcia stated that he understood, and that he agreed with the decision not to call Mr. Murphy as a defense witness at trial." Gov't Moskowitz Decl., ¶ 6. See also 2/22/24 Tr. 24:20-23. Thereafter, Mr. Garcia never "indicate[d] that he expected Mr. Murphy to be called as a defense witness at trial." Gov't Moskowitz Decl., ¶ 7.

Mr. Garcia tells a different story. According to Mr. Garcia, "[a]t some point in 2023, Mr. Moskowitz informed [him] that he had been appointed to represent . . . [Mr.] Murphy." Garcia Aff., ¶ 4, ECF No. 330-1. And "[p]rior to trial, Mr. Moskowitz discussed the possibility of calling Mr. Murphy as a witness for my defense" and "explained that if he did call Mr. Murphy at trial, he would have to step down from representing Mr. Murphy." Id. ¶ 5. Mr. Garcia apparently "understood from that conversation that Mr. Moskowitz would step down from representing Mr. Murphy and would call Mr. Murphy as a defense witness" at trial. Id. ¶ 6.

Although the conversation with Mr. Murphy was a dead-end, Mr. Moskowitz was separately conducting a thorough investigation to

prepare Mr. Garcia's defense. Mr. Moskowitz hired "a private investigator, . . . ran down every possible lead, interviewed every witness [he and his team] could find," including "every witness that Mr. Garcia had suggested that [they] interview." 2/22/24 Tr. 11:25-12:3.[4] And despite all those efforts, Mr. Moskowitz and his team were never able "to corroborate" Mr. Murphy's "story." 2/22/24 Tr. 12:4.

Ultimately, neither the Government nor Mr. Moskowitz informed the Court about Mr. Moskowitz's representation of Mr. Murphy. The Court accordingly never held a <u>Curcio</u> hearing on this alleged conflict. Mr. Murphy was never once mentioned at the trial. 2/22/24 Tr. 62:13-16. Mr. Moskowitz did not cross-examine CW-1 about whether he told Mr. Murphy about the murder. <u>See</u> 2/22/24 Tr. 35:23-25. And neither side called Mr. Murphy as a witness.

Then, according to Mr. Garcia, on November 22, 2023, he "saw Mr. Murphy in the visitor room at the MDC." Garcia Aff., ¶ 8. Mr. Murphy then told Mr. Garcia that "he had informed Mr. Moskowitz that he had been willing to testify on [Mr. Garcia's] behalf and tell the jury that [CW-1] was lying." <u>Id.</u> ¶ 9. "Specifically, Mr. Murphy" said he "would have testified that that [CW-1] never told Mr. Murphy that he witnessed the murder of [Joey] McClinton." <u>Id.</u> ¶ 10. Mr. Garcia then claims that "Mr. Murphy also [said] . . . he knew that it was not [Mr. Garcia] who committed the murder and that it was someone else." <u>Id.</u>

---

[4] The private investigator, however, never spoke with Mr. Murphy. 2/22/24 Tr. 21:3-5. This is because Mr. Moskowitz did not "see any basis for further investigation" of Mr. Murphy "that would have been productive or helpful to Mr. Garcia." 2/22/24 Tr. 34:23-35:3.

¶ 11. Mr. Murphy's story is similar. According to Mr. Murphy, he approached Mr. Garcia while on the visiting floor at the MDC. Mr. Murphy "apologize[d] for the things [Mr. Garcia was] going through" and said that he never spoke with CW-1 "about the case or nothing prior." 2/22/24 Tr. 40:18-41:21, 43:6-44:5.

At the hearing, the Court pressed Mr. Murphy about his motives for approaching Mr. Garcia at the MDC. In response, Mr. Murphy queried, "can I answer this truthful?" 2/22/24 Tr. 52:6-23. After which Mr. Murphy's attorney, Richard Palma, excitedly interjected, "No, no, everything's the truth. Let's put it with parameters." 2/22/24 Tr. 52:24-25. After conferring with counsel, Mr. Murphy then said he was acquaintances with Mr. Garcia and that he "approached [Mr.] Garcia because [he] knew that he was being charged with [Joey] McClinton's murder," which he "basically knew . . . was wrong." 2/22/24 Tr. 53:2-54:2. However, the basis for Mr. Murphy's opinion that Mr. Garcia was wrongfully charged was based on Mr. Murphy hearing "on the street" that Mr. Garcia was "not the person that killed [Joey] McClinton." 2/22/24 Tr. 54:3-25. At other points during his hearing testimony, Mr. Murphy confirmed that he did not "see the murder" or "hear about the murder at the time." 2/22/24 Tr. 41:22-25.

Then, in January 2024, Mr. Moskowitz and Ms. Sanderson together visited Mr. Murphy to discuss Mr. Garcia's case. Gov't Moskowitz Decl., ¶¶ 8-9. A paralegal, who was employed by Ms. Sanderson, was also present for the conversation. According to the paralegal, Mr. Murphy said that CW-1 "never told him anything about the murder of Alfonso

Joey McClinton" and "that he never gave [CW-1] any money." Def. Reply Ex. E, ¶¶ 3-4, ECF No. 336-5. See also 2/22/24 Tr. 20:7-13, 51:9-13. Additionally, when Mr. Moskowitz said he could not "call Mr. Murphy as a witness because Mr. Murphy would have provided information that was harmful to Mr. Garcia on the racketeering charges, specifically that Mr. Garcia was a leader of the YG Gang," Mr. Murphy "corrected" him. Def. Reply Ex. E, ¶¶ 5-6. Mr. Murphy explained that "he would not have testified that Mr. Garcia was a leader of the YG and that Mr. Garcia was not a gang member at the time of Mr. McClinton's homicide." Id. ¶ 6. See also 2/22/24 Tr. 20:14-16, 51:14-52:5.

After this initial meeting, "Ms. Sanderson did not request any additional meetings with Mr. Murphy" until the Government submitted its opposition brief. See Gov't Moskowitz Decl., ¶ 9. Ms. Sanderson then procured a signed affidavit from Mr. Murphy. In that affidavit, Mr. Murphy stated he was from "the same neighborhood as [Mr.] Garcia," and "was close friends with [Joey] McClinton before he was killed." Def. Reply Ex. D. ("Murphy Aff."), ¶¶ 1-2, ECF No. 336-4. Mr. Murphy also stated that he told Mr. Moskowitz, when he met with him in June of 2023 about Mr. Garcia's case, that CW-1 "never told [him] that he witnessed the murder of [Joey] McClinton and never spoke to [him] about the murder." See id. ¶ 3.

## II.   Legal Standard

Pursuant to Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "On such a motion, the defendant

bears the burden of proving that he is entitled to a new trial, and in order to grant a new trial, a district court must find that there is a real concern that an innocent person may have been convicted." United States v. Hunter, 32 F.4th 22, 30 (2d Cir. 2022).[5] "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001). And "[w]hile . . . [Federal Rule of Criminal Procedure] 33 gives the district court broad discretion to grant a new trial, district courts must exercise that discretion sparingly and in the most extraordinary circumstances, and only in order to avert a perceived miscarriage of justice." United States v. Gramins, 939 F.3d 429, 444 (2d Cir. 2019).

## III.  Discussion

Mr. Garcia's motion asserts three related grounds for granting a new trial. First, defense counsel argues that the failure to conduct a Curcio hearing should automatically result in the granting of a new trial. Second, defense counsel argues that Mr. Moskowitz had an actual conflict of interest that resulted in a lapse in his representation of Mr. Garcia. Third and finally, defense counsel argues that Mr. Moskowitz had a potential conflict of interest that prejudiced Mr. Garcia. For the reasons discussed below, the Court finds all of these arguments to be without merit.

---

[5] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

### a. Timeliness of the Motion

Before turning to the merits, the Court must address the threshold issue of whether the Rule 33 motion is timely. Under the Federal Rules of Criminal Procedure, "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). Here, Mr. Garcia's motion was not filed within 14 days of the jury's verdict. However, the 14-day rule is not jurisdictional, Eberhart v. United States, 546 U.S. 12, 16, 19 (2005), so Federal Rule of Criminal Procedure 45 permits the Court to extend the time for the filing of a new trial motion upon a showing of "excusable neglect," Fed. R. Crim. P. 45(b)(1)(B). See United States v. Brown, 623 F.3d 104, 113 n.5 (2d Cir. 2010); United States v. Owen, 559 F.3d 82, 83-84 (2d Cir. 2009). "Courts have considered the following factors in assessing the existence of excusable neglect: (1) the risk of prejudice to the government; (2) the length of the delay and the impact on the proceedings; (3) the reason for the delay and whether it was within the defendant's control; and (4) the defendant's good faith or lack thereof in asking for an extension." United States v. Ketabchi, 17-cr-243-3, 2019 WL 1510444, at *2 (S.D.N.Y. Mar. 25, 2019).

The Court finds that there was excusable neglect. Because Mr. Garcia's current counsel was not appointed until the end of August 2023, it is reasonable that it took her until November 2023 to discover that a handful of documents produced in this case referenced Mr. Murphy and that Mr. Moskowitz concurrently represented Mr. Murphy in a

separate criminal proceeding. Although Mr. Garcia knew about Mr.
Moskowitz's concurrent representation of Mr. Murphy as early as June
2023, there is no indication in the record that Mr. Garcia comprehended
the potential legal implications of that representation. Additionally,
the Government has made no showing of prejudice. Finally, even though
this motion has delayed Mr. Garcia's sentencing, any delay is
reasonable to ensure there was no conflict of interest because Mr.
Garcia faces a mandatory minimum of life imprisonment on the murder
in aid of racketeering charge. The Court accordingly will consider Mr.
Garcia's motion on the merits.

### b. Failure to Conduct a <u>Curcio</u> Hearing

Mr. Garcia first asserts that he is entitled to a new trial
because the Court failed to conduct a <u>Curcio</u> hearing. The Court
disagrees.

"When a possible conflict has been entirely ignored" by the
district court, then "reversal is automatic." <u>United States v. Levy</u>,
25 F.3d 146, 153-54 (2d Cir. 1994). However, this "automatic reversal
rule applies only when a district court . . . fails to conduct an
inquiry after either a timely conflict objection or if the [district]
court knows or reasonably should know a particular conflict exists."
<u>Id.</u> at 154. Here, defense counsel concedes that the Court was never
made aware of any alleged actual or potential conflict of interest
arising from Mr. Moskowitz's representation of Mr. Murphy. Def. Opening
Br., at 12-13. That concession is fatal to the defense's argument.
That is because all the cases that defense counsel relies upon, where

16

convictions were vacated, involved judges who were made aware of the conflict of interest and then failed to follow the appropriate procedures under Curcio. See, e.g., Levy, 25 F.3d at 154-60 (vacating the defendant's conviction because the district court, after learning of the potential conflict, failed to conduct a Curcio hearing and there was an actual conflict of interest that adversely affected counsel's performance); United States v. Iorizzo, 786 F.2d 52, 53-59 (2d Cir. 1986) (similar); United States v. Malpiedi, 62 F.3d 465, 466-70 (2d Cir. 1995) (similar); United States v. Kliti, 156 F.3d 150, 152-57 (2d Cir. 1998) (vacating the defendant's conviction because the district court, after learning of the potential conflict, failed to conduct a Curcio hearing and there was a potential conflict of interest that prejudiced the defendant). Because the Court was not aware of any alleged conflict of interest, the failure to investigate the conflict of interest and conduct a Curcio hearing is not a basis for granting a new trial.

To her credit, defense counsel appears to acknowledge the facial inapplicability of the automatic reversal rule here. See Def. Mem. in Further Supp. of Mot. for a New Trial ("Def. Reply Br."), at 4 n.4, ECF No. 336. However, defense counsel still makes a policy pitch for why the Court should break new ground and apply the rule here. Specifically, defense counsel urges the Court to apply the automatic reversal rule because "[t]he government and counsel should not be incentivized to keep potential conflict issues from the court's awareness." Def. Opening Br., at 12. While the Court agrees it is

imperative that the parties bring any potential conflicts to the Court's attention, any issues arising from a conflict of interest of which the Court was unaware can be adequately redressed under the normal framework that applies to determine whether to grant a new trial based on an actual or potential conflict of interest. See Kliti, 156 F.3d at 153. Accordingly, the Court concludes that the Court's failure to conduct a Curcio hearing, when it was never informed of the alleged conflict, does not provide a basis for granting Mr. Garcia a new trial.

### c. Actual Conflict of Interest

Defense counsel also asserts that Mr. Moskowitz had an actual conflict of interest that requires a new trial. "In order for a defendant to prevail on a claim that he was denied effective assistance of counsel based on counsel's actual conflict, the defendant must . . . establish that (a) counsel actively represented conflicting interests, and (b) such conflict adversely affected his lawyer's performance." United States v. Feyrer, 333 F.3d 110, 116 (2d Cir. 2003). If both these requirements are met, "a defendant is entitled to a presumption of prejudice." United States v. Rivernider, 828 F.3d 91, 109 (2d Cir. 2016).

"[A]n attorney has an actual, as opposed to potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." Feyrer, 333 F.3d at 116. However, even if there is an actual conflict of interest, "a

defendant [still] must prove that the conflict manifested itself as an actual lapse in representation" to be entitled to a new trial. Id. "To prove the lapse in representation a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." Id.

In her briefs, defense counsel has trotted out no fewer than four theories of supposed conflict, none of which, however, successfully identifies an actual conflict, let alone one that resulted in a lapse in representation.

### i. Defense theory 1: Mr. Murphy was a defense witness.

The first of the defense's theories is that the interests of Mr. Garcia and Mr. Moskowitz diverged with respect to whether to cross-examine CW-1 about telling Mr. Murphy about the murder and about whether to call Mr. Murphy as a witness. According to the defense, Mr. Moskowitz had a duty to advise Mr. Murphy against testifying, if doing so could lead to perjury charges or draw attention to Mr. Murphy's past criminal acts that were detailed in the 3500 materials. On the other hand, Mr. Garcia had an interest in pursuing all available routes to undermine the credibility of the Government's eyewitness. Thus, the defense theorizes that Mr. Moskowitz's interests in protecting Mr. Murphy diverged from Mr. Garcia's interests in mounting a vigorous defense. However, the problem with this theory is that it was clearly

in Mr. Garcia's interests for Mr. Moskowitz to avoid cross-examining CW-1 about Mr. Murphy and to not call Mr. Murphy as a witness.

To start, the Court entirely discounts Mr. Garcia's claims that after Mr. Moskowitz spoke with him about Mr. Murphy, he believed that "Mr. Moskowitz would step down from representing Mr. Murphy and would call Mr. Murphy as a defense witness in my trial." Garcia Aff. ¶ 6. As already noted, Mr. Garcia has repeatedly and blatantly lied to the Court. Moreover, when Mr. Garcia wrote to the Court in August 2023 about the breakdown in his relationship with Mr. Moskowitz, Mr. Garcia said nothing about Mr. Moskowitz's failure to call Mr. Murphy as a witness at trial. That omission is glaring. The Court accordingly credits Mr. Moskowitz's testimony that he informed Mr. Garcia that Mr. Murphy should not be called as a defense witness and that Mr. Garcia agreed with that decision.

Furthermore, even if Mr. Garcia had (contrary to what the Court finds to be the facts) disagreed with Mr. Moskowitz about whether to call Mr. Murphy as a witness or cross-examine CW-1 about telling Mr. Murphy about the murder, that would not have created an actual conflict of interest because it was not in Mr. Garcia's interest to take either of those actions and because there was nothing material at issue. Based on the record evidence, it is clear to the Court that Mr. Murphy had no admissible evidence helpful to Mr. Garcia, and that, indeed, the evidence that Mr. Murphy did have would have been harmful to Mr. Garcia's case. Thus, not only was any potentially helpful information that Mr. Murphy had immaterial, but it was also plainly against Mr.

Garcia's interests to have Mr. Murphy testify because he had damning evidence against Mr. Garcia. See 2/22/24 Tr. 31:17-18.[6] Furthermore, if Mr. Moskowitz had cross-examined CW-1 about whether he told Mr. Murphy about the murder, he would have been stuck with CW-1's answer, as any testimony from Mr. Murphy about whether he spoke with CW-1 would have been inadmissible collateral evidence of a specific instance of untruthfulness. See United States v. Purdy, 144 F.3d 241, 245-46 (2d Cir. 1998) ("Extrinsic evidence offered for impeachment on a collateral issue is properly excluded."); Fed. R. Evid. 608(b) ("Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."). It would thus have been a risky and potentially damaging gamble to cross-examine CW-1 about this topic, as it is highly unlikely CW-1 would have admitted he never told Mr. Murphy about the murder when he repeatedly told the Government that he had. Accordingly, Mr. Moskowitz correctly concluded that Mr. Garcia and Mr. Murphy's interests aligned

---

[6] Garcia's counsel asserts that Mr. Murphy would have testified that "Mr. Garcia was not the leader of the YG GMGz at the time of the murder." Def. Post-Hearing Mem. in Further Supp. of Mot. for a New Trial ("Def. Post-Hearing Br."), at 14, ECF No. 344. But what Mr. Murphy actually affirmed under oath is that he "would not have testified that Mr. Garcia was a leader of the YG or a gang member at the time of Mr. [Mc]Clinton's homicide." 2/22/24 Tr. 52:2-5. However, not testifying to a fact is different than affirming that the opposite is true. The Court suspects that Mr. Murphy would not have affirmed that Mr. Garcia was not a gang member under oath, as Mr. Murphy previously told law enforcement that Mr. Garcia was part of the YG GMGz. See Gov't Ex. A (telling the police that "Israel Garcia and his older brother are part of a street crew from East 183 Street and Creston Avenue named 'Y.G.' or 'Young Gunnas.'").

on this issue and there was thus no conflict. See 2/22/24 Tr. 23:17-23.[7]

And once again, even assuming (contrary to the facts as found by the Court) that there was an actual conflict of interest over this issue, the defense has not shown a lapse in representation stemming from it. Mr. Murphy was not a viable defense witness because, in the Court's estimation, Mr. Murphy is a complete and total liar, who had no helpful, admissible evidence for Mr. Garcia. The police twice interviewed Mr. Murphy, and in both of those interviews, Mr. Murphy gave statements that implicated Mr. Garcia in the murder of Joey McClinton (while at the same time admitting he had no first-hand knowledge of the murder). See Gov't Ex. A; Gov't Ex. B. But at the hearing before the Court, Mr. Murphy denied ever having made those statements, before then invoking his Fifth Amendment rights. 2/22/24 Tr. 42:1-5, 44:15-45:25, 55:12-21. But, whereas the police had no motive to twice fabricate that Mr. Murphy told them about the murder of Joey McClinton and incriminated Mr. Garcia, Mr. Murphy has a substantial motive to equivocate, if not outright lie about the matter.

---

[7] Nor does the fact that Mr. Moskowitz was unable to disclose all the details of his conversation with Mr. Murphy to Mr. Garcia when explaining why Mr. Murphy was not a good defense witness alter the Court's conclusion that there is no actual conflict. Mr. Moskowitz testified that he could have obtained a waiver to disclose that information but never did so because Mr. Murphy did not have any useful information. See 2/22/24 Tr. 19:12-14. This shows Mr. Moskowitz's relationship with Mr. Murphy did not prevent him from sharing the information; a waiver could have obviated that impediment. Rather, it was the more fundamental issue -- that Mr. Murphy provided no admissible, useful evidence -- that caused Mr. Moskowitz to rest on the attorney-client privilege and not disclose specific details.

When on the stand, the Court pressed Mr. Murphy about why he approached Mr. Garcia at the MDC, and at one point, Mr. Murphy asked in open court whether he could start telling the truth. 2/22/24 Tr. 52:6-23. After conferring with his lawyer, Mr. Murphy then said that Mr. Garcia was his acquaintance and that he approached Mr. Garcia because he knew it was wrong that Mr. Garcia was being charged with murder, based on rumors he heard on the street. 2/22/24 Tr. 53:2-54:25. The Court may never get a truthful answer from Mr. Murphy about why he approached Mr. Garcia, but the explanation that was provided to the Court does not pass the laugh test, when all the other record evidence indicates that Mr. Murphy was a member of a rival gang and was good friends with the victim. This all leads the Court to conclude that Mr. Murphy has no credibility.

Setting aside Mr. Murphy's dubious credibility, even if CW-1 did not tell Mr. Murphy about the murder and Mr. Murphy heard there was an alternate perpetrator, Mr. Murphy's testimony to that effect would have been inadmissible at trial. To start, Mr. Murphy told the police, and again told the Court, that he has no personal knowledge about the murder; instead, his theories about an alternate perpetrator are based on hearsay and rumor. See Gov't Ex. A; Gov't Ex. B; 2/22/24 Tr. 41:22-25.[8] Furthermore, as explained above, Mr. Murphy's testimony that CW-

_____

[8] The defense speculates that Mr. Murphy did have first-hand knowledge about Mr. Garcia's case because Mr. Murphy was a drug-dealer in the same neighborhood as Mr. Garcia, Mr. Murphy knew many of individuals involved in the case, Mr. Murphy was friends with Joey McClinton, Mr. Murphy has children with Joey McClinton's sister, and CW-5 stated that Mr. Murphy was present at the murder. See Def. Reply Br., at 2-5.

1 never told him about the murder would have been inadmissible collateral evidence under Federal Rule of Evidence 608(b). The fact that Mr. Murphy's evidence about CW-1 is inadmissible would also render it fruitless to cross-examine CW-1 about whether he told Mr. Murphy about the murder, when counsel would be stuck with CW-1's answer.[9] Furthermore, the record evidence indicates that on cross-examination, Mr. Murphy would have been forced to disclose harmful information about Mr. Garcia's case, as he had evidence that was "potentially devastating" for Mr. Garcia and he previously implicated Mr. Garcia in the murder when he spoke to the police.[10] See, e.g., 2/22/24 Tr. 31:17-18; Def. Reply Ex. A, at 43 (CW-1 "described conversations w/ Smash approx. 2-3 years after McClinton murder about how conflict

---

However, the Court has been provided with no reason to trust CW-5's statement that Mr. Murphy was present at the murder, when all the other evidence before the Court indicates the contrary is true. It is therefore entirely speculative that Mr. Murphy has firsthand knowledge about the murder. Additionally, just because Mr. Murphy ran in the same social circles as Mr. Garcia and the victim does not mean that Mr. Murphy had helpful information related to Mr. Garcia's case.

[9] It is also worth noting that nothing about Mr. Moskowitz's representation of Mr. Murphy would have prevented Mr. Moskowitz from cross-examining CW-1 about his inconsistent statements to the Government regarding when he told Mr. Murphy about the murder. That would not, as the defense claims, have drawn attention to Mr. Murphy or exposed Mr. Murphy to criminal exposure, because that line of questioning would be solely focused on CW-1's credibility. It was reasonable, however, for Mr. Moskowitz to conclude that any questioning about those inconsistencies would be a dead-end, because evidence that those inconsistencies indicate that CW-1 was lying would have been inadmissible collateral evidence.

[10] Because Mr. Murphy was so uncredible in his testimony before the Court, the Court finds that Mr. Murphy did, in fact, speak with the police and implicate Mr. Garcia in the murder based on rumors he heard.

started b/c Shorty Rock was upset Smash/183 wouldn't turn YG under Shorty Rock".); Gov't Ex. A; Gov't Ex. B. Accordingly, any reasonable defense attorney would have concluded that Mr. Murphy was not a viable witness (both because his purportedly helpful testimony was inadmissible and because the evidence he did have was harmful to Mr. Garcia). Furthermore, any reasonable attorney would have concluded it was foolish to cross-examine CW-1 about whether he told Mr. Murphy about the murder when defense counsel would then just be stuck with the answer. The Court thus concludes that these tactics did not "possess[] sufficient substance to be a viable alternative." Feyrer, 333 F.3d at 116. See also Malpiedi, 62 F.3d at 469 ("[A] foregone strategy or tactic may be so insubstantial" or "so clearly against the defendant's interest" that "even the most ardent and talented, conflict-free advocate would likely have avoided it.").

### ii. Theory 2: Failure to Investigate

Defense counsel's second conflict theory is that Mr. Moskowitz and Mr. Garcia had differing interests regarding whether to further investigate the information that Mr. Murphy allegedly had about Mr. Garcia's case. According to the defense, Mr. Garcia had an interest in investigating whether Mr. Murphy accurately identified an alternate perpetrator or whether Mr. Murphy had other evidence that could be helpful to Mr. Garcia, while on the other hand Mr. Moskowitz "had an ethical obligation to refrain from investigating Mr. Murphy." Def. Opening Br., at 15. The Court however finds that there are multiple problems with this theory.

First, defense counsel has not provided any legal support for the proposition that Mr. Moskowitz had an ethical obligation not to investigate facts relating to Mr. Murphy, and the Court has never heard of such an ethical duty. Indeed, it is routine for counsel to a party or a witness to try to determine all relevant facts, positive or negative about their client, in order to help that client to properly prepare. Of course, Mr. Moskowitz could not use the fruits of such an investigation to harm Mr. Murphy, but there is no indication on this record that this was the situation Mr. Moskowitz was facing.[11] Accordingly, there was nothing about Mr. Moskowitz's representation of Mr. Murphy that prevented him from further investigating any information that Mr. Murphy could have provided, including by speaking to the individuals from whom Mr. Murphy heard the rumors that Piggy committed the murder.

Second, there is no indication that Mr. Moskowitz's representation of Mr. Murphy hindered his investigation of any

---

[11] Contrary to defense counsel's characterization of the record, Mr. Moskowitz never said it was against Mr. Murphy's interests to further investigate any information that Mr. Murphy may have had. Compare Def. Post-Hearing Br. at 9-10 ("Trial counsel testified that there were many reasons that continuing to investigate or call the government's attention to Mr. Murphy would be harmful, and it was in Mr. Murphy's interest not to investigate further." (citing 2/22/24 Tr. 23:17-21)), with 2/22/24 Tr. 23:17-21 ("Q: And at the time, you believed it was in Mr. Murphy's best interest not to call attention to Mr. Murphy to the government, correct? A: I believed it was in Mr. Murphy's best interest and Mr. Garcia's best interest that Mr. Murphy not testify."); 2/22/24 Tr. 36:1-5 ("Q. You recognize, Mr. Moskowitz, that there was a conflict between your representation of Garcia and Murphy because your duty to protect Murphy conflicted with your duty to get as much information as possible from Mr. Murphy; correct? A. No.").

information that Mr. Murphy may have had. For starters, Mr. Moskowitz met with Mr. Murphy to investigate whether Mr. Murphy had any helpful, admissible information. The defense speculates that this one meeting with Mr. Murphy was facially insufficient to investigate Mr. Murphy's "extensive knowledge about the case," especially because "the need to maintain Mr. Murphy's trust within the attorney-client relationship would have hindered [Mr. Moskowitz's] ability to press Mr. Murphy on any contradictory or negative facts he provided regarding Mr. Garcia's case." Def. Reply Br., at 6. See also Def. Post-Hearing Br., at 8-9. But it has been established that Mr. Murphy had no personal knowledge about this case (other than information about CW-1). Again, the fact that Mr. Murphy knew some of the individuals involved in the case and was allegedly involved in gang activity in the neighborhood does not mean, as defendant counsel contends, that he knew anything about Mr. Garcia's case, let alone knew information that would be helpful to Mr. Garcia. Furthermore, it is wholly theoretical to postulate that Mr. Moskowitz did not press Mr. Murphy regarding negative information about Mr. Garcia's case. If anything, the evidence indicates to the contrary, as Mr. Moskowitz learned during his meeting that Mr. Murphy possessed information that was "potentially devastating" for Mr. Garcia's case. 2/22/24 Tr. 31:17-21. Additionally, Mr. Moskowitz did independently conduct an extensive investigation, using a private investigator, to develop Mr. Garcia's defense, but that private investigator was unable to corroborate Mr. Murphy's story. 2/22/24 Tr.

11:25-12:4.[12] The most likely explanation for the investigator's inability to corroborate Mr. Murphy's story is not that the investigator needed more information from Mr. Murphy himself but that likely there was nothing to the rumors about Piggy that Mr. Murphy reported to the police.

In sum, not only was there no conflict stemming from Mr. Moskowitz's duty to investigate, but there was also no lapse in the representation, as Mr. Moskowitz did, in fact, conduct an extensive investigation. See Malpiedi, 62 F.3d at 469 (Defendant must "show that a conflict existed that was inherently in conflict with a plausible line of defense or attack on the prosecution's case."); Winkler v. Keane, 7 F.3d 304, 309 (2d Cir. 1993) ("To demonstrate adverse effect, a defendant must establish that an actual lapse in representation resulted from the conflict."). The Court thus concludes this conflict theory has no merit.

### iii. Theory 3: Mr. Murphy was a government witness.

Incredibly, defense counsel at one point also pressed the argument that Mr. Murphy was a government witness because the Government produced Mr. Murphy's prior statements as 3500 materials. Certainly, there would have been an actual conflict if the Government called Mr.

---

[12] It is true that the private investigator never spoke with Mr. Murphy. 2/22/24 Tr. 21:3-5. But as has been repeatedly noted, Mr. Murphy did not have any firsthand knowledge that would be helpful to Mr. Garcia, besides inadmissible collateral evidence about CW-1. Therefore, Mr. Moskowitz correctly concluded, as any reasonable attorney would, that there was no "basis for further investigation" of Mr. Murphy "that would have been productive or helpful to Mr. Garcia." 2/22/24 Tr. 34:23-35:3.

Murphy to testify. <u>See, e.g.</u>, <u>Iorizzo</u>, 786 F.2d at 58. But the Government did not call Mr. Murphy as a witness and repeatedly represented that it never intended to call Mr. Murphy as a witness. For good reason: Mr. Murphy is simply not credible. There is thus no conflict of interest based on this speculative theory.

### iv. Theory 4: Mr. Moskowitz had a financial conflict.

Finally, the defense casually suggests that Mr. Moskowitz had a conflict of interest because of his financial incentive to continue representing two defendants, instead of one. That contention has no merit and borders on frivolous. Mr. Moskowitz was <u>CJA</u> counsel for <u>both</u> defendants, which would entitle Mr. Moskowitz to a meager amount in hourly fees. That is hardly a financial incentive to continue representing two defendants. Furthermore, the financial interest (if any) that Mr. Moskowitz had is completely unlike the cases where the Second Circuit has found an attorney's financial interest created an actual conflict. <u>See, e.g.</u>, <u>Winkler</u>, 7 F.3d at 307-08 (the conflicted attorney had a contingent fee arrangement with the criminal defendant); <u>United States v. Schwarz</u>, 283 F.3d 76, 91-97 (2d Cir. 2002) (finding an un-waivable, actual conflict when the attorney's "representation of [the defendant] was in conflict not only with his ethical obligation to the PBA as his client, but also with his own substantial self-interest in the two-year, $10 million retainer agreement his newly formed firm had entered into with the PBA."). The Court accordingly concludes there was no financial conflict of interest.

In sum, the Court concludes that the defense has utterly failed to identify an actual conflict of interest, let alone one that resulted in a lapse in representation.

### d. Potential Conflict of Interest

It is not clear to the Court if defense counsel is continuing to press the theory that Mr. Moskowitz suffered from a potential conflict of interest. But to the extent the defense is still relying on this theory, it is totally without merit.

To show that a defendant is entitled to a new trial based on a potential conflict of interest, the defendant must show his attorney had "a potential conflict of interest that resulted in prejudice to the defendant." Levy, 25 F.3d at 152. "A potential conflict of interest exists if the interests of the defendant may place the attorney under inconsistent duties at some time in the future." Kliti, 156 F.3d at 153 n.3. In its opening brief, the defense argued that Mr. Moskowitz had "a potential conflict . . . because . . . the simultaneous representation of Mr. Garcia and Mr. Murphy caused at least the potential that trial counsel's interest would diverge from Mr. Garcia's." Def. Opening Br., at 21-22. However, even assuming arguendo that that is true, there has been no showing of prejudice.

To show prejudice, a defendant must prove "that but for counsel's unprofessional errors, the result of the proceeding would have been different." United States v. Arrington, 941 F.3d 24, 41 (2d Cir. 2019). The defense cannot make that showing because, as found above, the defense has failed to show that Mr. Moskowitz's concurrent

representation led to a lapse in representation, a much lower standard than actual prejudice. See Feyrer, 333 F.3d at 120. The Court thus concludes that Mr. Garcia is not entitled to a new trial based on a potential conflict of interest.

**IV.   Conclusion**

For the foregoing reasons, the Court, by Order dated April 5, 2024, denied Mr. Garcia's motion for a new trial.

Dated:     New York, NY
           May 7, 2024

                                   JED S. RAKOFF, U.S.D.J.